**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| FELISSA H. FERRELL o/b/o A.I., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )      1:21CV126 |
| | ) |
| KILOLO KIJAKAZI, | ) |
| Acting Commissioner of | ) |
| Social Security, | ) |
| | ) |
| Defendant.[1] | ) |

<u>**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**</u>

Plaintiff Felissa H. Ferrell, brought this action as guardian ad litem on behalf of A.I., a minor child, pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security, determining that A.I.'s entitlement to Child Supplemental Security Income ("CSSI") ended on March 9, 2018. (Docket Entry 1.) Defendant has filed the certified administrative record (Docket Entry 13 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 16, 19; <u>see also</u> Docket Entry 17 (Plaintiff's Brief); Docket Entry 20 (Defendant's Memorandum)). For the reasons that follow, the Court should enter judgment for Defendant.

---

[1] President Joseph R. Biden, Jr., appointed Kilolo Kijakazi as the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted for Andrew M. Saul as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

# I.  PROCEDURAL HISTORY

A.I.'s mother applied for CSSI on A.I.'s behalf (Tr. 397-404) and, on May 4, 2014, the Social Security Administration ("SSA") found A.I. disabled as of August 30, 2013, the protective filing date of her application for CSSI (see Tr. 66; see also Tr. 397).

On March 9, 2018, the SSA sent A.I.'s mother a notice advising her that, as a result of a Continuing Disability Review ("CDR") which showed medical improvement in A.I.'s condition, she stopped qualifying for CSSI as of March 2018.  (Tr. 189-93; see also Tr. 170-86.)  Following denials of a challenge to that determination at the reconsideration level (Tr. 187, 194-97, 749-54, 779-85, 804-06) and by a Disability Hearing Officer (Tr. 188, 202-31), A.I.'s mother sought a hearing before an ALJ (Tr. 232-35).  A.I., her mother, A.I.'s attorney, and a vocational expert ("VE") attended the hearing. (Tr. 131-69.)  Following the hearing, the ALJ sent written interrogatories to a medical expert ("ME") (Tr. 1077-88) and then sent the ME's written answers to the interrogatories to A.I.'s attorney (Tr. 582-83, 1096-1105).  A.I.'s attorney submitted a written response to the ME's interrogatory answers, requesting a supplemental hearing and opportunity to cross-examine the ME.  (Tr. 658-66.)  The ALJ thereafter convened a supplemental hearing, which A.I., her mother, A.I.'s attorney, and the ME attended.  (Tr. 92-

2

130.)[2]  Shortly after that hearing, the ALJ determined that A.I.'s disability ended as of March 2018 (Tr. 60-84), and A.I.'s attorney requested review with the Appeals Council (Tr. 394-96, 670-82, 684-87).  The Appeals Council subsequently denied A.I.'s request for review (Tr. 3-8), making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that decision, the ALJ made the following findings later adopted by the Commissioner:

> 1.  The most recent favorable medical decision finding that [A.I.] was disabled is the determination dated May 4, 2014 with disability onset of August 30, 2013.  This is known as the "comparison point decision" or CPD.
>
> 2.  At the time of the CPD, [A.I.] had the following medically determinable impairment: hip dysplasia.  This impairment was found to meet Listing 101.[0]2A, Major Dysfunction of a Joint of 20 CFR Part 404, Subpart P, Appendix 1.
>
> . . .
>
> 3.  Medical improvement occurred as of March 9, 2018.
>
> . . .
>
> 4.  Since March 9, 2018, the impairments that [A.I.] had at the time of the CPD have not met or medically equaled Listing 101.02A of 20 CFR Part 404, Subpart P, Appendix 1 as that listing was written at the time of the CPD.
>
> . . .
>
> 6.  Since March 9, 2018, the impairments that [A.I.] had at the time of the CPD have not functionally equaled the Listings of Impairments.

---

[2] A.I. did not testify at the supplemental hearing.  (See Tr. 92-130.)

. . .

7.   Since March 9, 2018, [A.I.] has had the following severe impairments: speech and language delay, scoliosis, borderline intellectual functioning, and history of hip dysplasia.

. . .

8.   Since March 9, 2018, [A.I.] has not had an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

9.   Since March 9, 2018, [A.I.] has not had an impairment or combination of impairments that functionally equals the listings.

. . .

10.   [A.I.]'s disability ended as of March 9, 2018, and [she] has not become disabled again since that date.

(Tr. 66-84 (bold font and internal parenthetical citations omitted).)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." <u>Hines v. Barnhart</u>, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of . . . review of [such a] decision . . . is extremely limited." <u>Frady v. Harris</u>, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has not established entitlement to relief under the extremely limited review standard.

4

## A.  Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).  Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard."  Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)).  "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation marks omitted).  "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence."  Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Social Security Commissioner]."  Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted).  "Where conflicting evidence allows reasonable minds to differ as to

5

whether a claimant is disabled, the responsibility for that decision falls on the [Social Security Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and a child under the age of 18 qualifies as disabled if he or she has "a medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations, and that can be expected to cause death or that has lasted or can be expected to last for a continuous period of not less than 12 months," 20 C.F.R. § 416.906. In resolving such a claim, the ALJ must follow a three-step sequential evaluation process to consider whether the child (1) has engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments; and (3) has an impairment or combination of impairments that meets, medically equals, or functionally equals a listed impairment. 20 C.F.R. § 416.924.

After a claimant qualifies for benefits under the Act, no presumption of continuing disability exists, see 42 U.S.C. § 423(f)(4); rather, the decision to award benefits remains subject to a periodic CDR, see 20 C.F.R. § 416.994a(a). The SSA utilizes the most recent prior determination granting benefits — the CPD — as a reference to evaluate whether any medical improvement has occurred in the child's medically determinable impairments. See 20 C.F.R. § 416.994a. To make this determination, the Commissioner employs a three-step sequential evaluation process ("SEP"):

> 1) Has any medical improvement occurred in the severity of the child's impairments since the CPD? If not, subject to a few exceptions, the SSA will find the child remains disabled.
>
> 2) If medical improvement has occurred, do the child's impairments at the time of the CPD still meet or equal the listing the impairments met or equaled at the time of the CPD? If so, absent an exception, the SSA will find the child still qualifies as disabled.
>
> 3) If not, does the child have any current, severe medically determinable impairments that meet, medically equal, or functionally equal any of the listings?

See 20 C.F.R. § 416.994a(b).

### B. Assignments of Error

Plaintiff asserts that the Court should overturn the ALJ's finding that A.I.'s disability ceased as of March 9, 2018, on these grounds:

1) "[r]emand to an ALJ for a rehearing is warranted for further evaluation of evidence first submitted to the Appeals

7

Council because this evidence is new, material, and relates to the period on or before the date of the ALJ's decision" (Docket Entry 17 at 9 (bold font omitted)); and

2) "[t]he ALJ erred by failing to properly evaluate A.I.'s functional limitations in the domain of '[A]ttending and [C]ompleting [T]asks,' as the evidence documents that [A.I.] has marked limitation in that domain" (id. at 19-20 (bold font and single-spacing omitted)).

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (See Docket Entry 20 at 12-23.)

### 1. New Evidence Submitted to the Appeals Council

In Plaintiff's first issue on review, she argues that "[r]emand to an ALJ for a rehearing is warranted for further evaluation of evidence first submitted to the Appeals Council because this evidence is new, material, and relates to the period on or before the date of the ALJ's decision." (Docket Entry 17 at 9 (bold font omitted).) In particular, Plaintiff contests the Appeals Council's finding that three pieces of new evidence from Rockingham County Schools, "an Individualized Education Plan [('IEP')] document . . . dated November 16, 2020" (id. at 12 (citing Tr. 10-29)), "an Auditory Processing Evaluation . . . dated October 14, 2020" (id. (citing Tr. 34-38)), and "a Psycho-[E]ducational Evaluation . . . dated September 9, 2020" (id. (citing Tr. 41-50)), "did 'not show a reasonable probability that

8

[they] would change the outcome of the decision'" (id. (quoting Tr. 4)). According to Plaintiff, "it is reasonably probable that A.I. would be found to meet and/or medically equal Listing 112.05B [for Intellectual Disorder] if the additional evidence submitted to the Appeals Council was properly considered by the Commissioner." (Id. at 19.) Plaintiff's contentions in that regard lack merit.

In SSI cases based on an application for benefits, the Appeals Council will review a case if it receives "new" and "material" evidence that "relates to the period on or before the date of the [ALJ's] hearing decision, [] there is a reasonable probability that the additional evidence would change the outcome of the [ALJ's] decision," 20 C.F.R. § 416.1470(a)(5), and "good cause" exists for the failure to submit the evidence at least five business days before the ALJ's hearing, 20 C.F.R. § 416.1470(b). However, those regulations further provide that, "[i]n reviewing decisions other than those based on an application for benefits, the Appeals Council will consider the evidence in the [ALJ] hearing record and any additional evidence it believes is material to an issue being considered." Id. (emphasis added).[3] Consistent with that

_____

[3] The official commentary accompanying the publication of the predecessor regulation to Section 416.1470(b) (which contained identical language, compare 20 C.F.R. § 416.1476(b)(2) (version effective through Feb. 4, 2016), with 20 C.F.R. § 416.1470(b)), clarifies that the phrase "decisions other than those based on an application for benefits" includes cessation of benefits cases such as Plaintiff's, as well as that, in such cases, the Appeals Council need not consider whether the new evidence relates to the period on or before the ALJ's decision. See "Limit on Future Effect of Applications and Related Changes in Appeals Council Procedures," 52 Fed. Reg. 4001, 4003 (Feb. 9, 1987) (providing

provision, the Appeals Council here considered A.I.'s new evidence, but found that the "evidence d[id] not show a reasonable probability that it would change the outcome of the decision." (Tr. 4.) The Appeals Council did not exhibit the new evidence (see Tr. 4, 6-7), but did include it as part of the administrative transcript before the Court (see Tr. 9-50). Accordingly, the Court must determine whether the new evidence, considered in light of the record as a whole, qualifies as material, i.e., whether it raises a reasonable probability of favorable outcome in A.I.'s case.

In order to meet the requirements of Listing 112.05B, a child claimant must demonstrate 1) "[s]ignificantly subaverage general intellectual functioning evidenced by . . . [a] full scale (or comparable) IQ score of 70 or below on an individually administered

---

that, "in SSI cases not based on an application for benefits (e.g., cases involving suspension or termination of benefits), the [Appeals Council] will consider additional evidence regardless of whether it relates to the period ruled on by the ALJ or to a subsequent period." (emphasis added)); see also Nieves v. Barnhart, No. 02CV9207, 2005 WL 668788, at *2 (S.D.N.Y. Mar. 23, 2005) (unpublished) (holding that, in reviewing decisions in cessation of benefits cases, Appeals Council should consider new evidence post-dating ALJ's decision "because an SSI claimant can reestablish eligibility during the post-cessation appeals process without having to file a new application"); accord Lakesha B. v. Saul, No. 4:19CV35, 2021 WL 372798, at *4 (W.D. Va. Feb. 3, 2021) (unpublished), recommendation adopted, slip op. (W.D. Va. Mar. 1, 2021); McIntire v. Astrue, 809 F. Supp. 2d 13, 23-24 (D. Conn. 2010). Furthermore, Plaintiff need not demonstrate that "good cause" existed for the failure to submit the new evidence at least five business days prior to the ALJ's hearing. See 20 C.F.R. § 416.1470(b); see also Hearings, Appeals, and Litigation Law Manual (HALLEX) I-3-3-6 "Additional Evidence," 1993 WL 643129 (May 1, 2017) ("Generally, the [Appeals Council] will only consider additional evidence as a basis for granting review if the claimant meets one of the good cause exceptions set forth in . . . 416.1470(b); . . . [h]owever, when the [Appeals Council] evaluates a decision that is not based on an application for benefits and involves [T]itle XVI of the Act (e.g., age 18 redeterminations, [CDRs], or terminations), the [Appeals Council] considers the evidence in the hearing record and any additional evidence it believes is material to an issue being considered.").

standardized test of general intelligence" and 2) "[s]ignificant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning: [u]nderstand, remember, or apply information; or [i]nteract with others; or [c]oncentrate, persist, or maintain pace; or [a]dapt or manage oneself."  20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 112.05B (subsection lettering and internal citations omitted).  A "marked" limitation "interferes <u>seriously</u> with [the child's] ability to independently initiate, sustain, or complete activities," 20 C.F.R. § 416.926a(e)(2)(i) (emphasis added), and an "extreme" limitation "interferes <u>very seriously</u> with [the child's] ability to independently initiate, sustain, or complete activities," and signals "the rating [the SSA] give[s] to the <u>worst</u> limitations," although it "does not necessarily mean a total lack or loss of ability to function," 20 C.F.R. § 416.926a(e)(3)(i) (emphasis added).

The record before the ALJ contained IQ scores for A.I. above the level for meeting Listing 112.05B (see Tr. 747 (reflecting a Full Scale IQ score of 75 on the Wechsler Preschool and Primary Scale of Intelligence - Fourth Edition ("WPPSI-IV"))) and that placed her cognitive abilities in the borderline intellectual functioning range (see Tr. 748).  Consistent with that evidence, the ALJ found that Plaintiff had severe borderline intellectual functioning (see Tr. 83) that did not meet or medically equal the

11

requirements of Listing 112.05 (Tr. 84). Although the ALJ thereafter provided an explanation supporting her determination that A.I.'s severe speech and language delay did not meet or medically equal certain listings, the ALJ neither provided any analysis explaining why she found that A.I.'s severe borderline intellectual functioning did not meet or medically equal the criteria of Listings 112.02 ("Neurocognitive disorders"), or 112.11 ("Neurodevelopmental disorders") nor evaluated the paragraph B criteria of those listings. (See id.)[4]

Additionally, none of the state agency psychological consultants provided opinions as to whether A.I.'s borderline intellectual functioning met or medically equaled Listings 112.02 or 112.11 and thus did not provide any ratings for the paragraph B criteria of those listings. (See Tr. 170-85, 749-54, 779-85, 804-06.) Moreover, the ME's written responses to the ALJ's interrogatories overlooked A.I.'s borderline intellectual functioning diagnosis, and focused entirely on analyzing the functional impact of her speech and language delay. (See Tr. 1096-1105.) As a result, the ME also did not provide any analysis of the paragraph B criteria of Listings 112.02 or 112.11. (See Tr. 1098 (analyzing only Listing 2.09, an adult listing for loss of

_____

[4] Listing 112.05B's adaptive deficit requirement involves the same findings contained in the paragraph B criteria of Listings 112.02 and 112.11. Compare 20 C.F.R. Part 404, Subpart P, App'x 1, § 112.05B(2), with id., §§ 112.02B, 112.11B.

12

speech), 1099 (providing no response to question regarding A.I.'s limitation in ability to understand, remember, or apply information).)

The absence of any ratings in the record of A.I.'s ability to understand, remember, or apply information complicates this Court's review of whether the new evidence submitted to the Appeals Council raises a reasonable probability that the ALJ would have found that A.I. had an "extreme" limitation in that functional area. Substantial overlap exists, however, between the mental functional area of understanding, remembering or applying information found in Listing 112.05B(2)(a) and the domain "Acquiring and Using Information" described in 20 C.F.R. § 416.926a(g) and assessed by the ALJ in determining whether A.I.'s impairments functionally equaled the listings (see Tr. 78-79).[5]

The introductory section to the listings for child mental disorders describes the functional area of understanding, remembering or applying information as follows:

> This area of mental functioning refers to the abilities to <u>learn, recall, and use information</u> to perform age-appropriate activities. Examples include: Understanding and learning terms, instructions, procedures; <u>following</u>

---

[5] "Domain analysis considers the child's age-appropriate functioning in relation to: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving around and manipulating objects; (5) caring for oneself; and (6) health and physical well being." Neal ex rel. Walker v. Barnhart, 405 F.3d 685, 689 (8th Cir. 2005). An ALJ must conduct such analysis to decide if an impairment that fails to meet or medically equal a listing nonetheless causes "limitations that functionally equal the listings," 20 C.F.R. § 416.926a(a).

one- or two-step oral <u>instructions</u> to carry out a task; <u>describing an activity</u> to someone else; <u>asking and answering questions</u> and <u>providing explanations</u>; recognizing a mistake and correcting it; identifying and <u>solving problems</u>; sequencing multi-step activities; and <u>using reason</u> and judgment to <u>make decisions</u>.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 112.00E.1.

The regulations, in turn, describe the domain of "Acquiring and Using Information" as follows:

In this domain, [the SSA] consider[s] how well you <u>acquire or learn information</u>, and how well you <u>use the information</u> you have learned.

. . .

Thinking is the application or use of information you have learned. It involves being able to perceive relationships, <u>reason</u>, and <u>make logical choices</u>. People think in different ways. When you think in pictures, you may <u>solve a problem</u> by watching and imitating what another person does. When you think in words, you may <u>solve a problem</u> by using language to talk your way through it. You must also be able to use language to think about the world and to <u>understand others and express yourself</u>; e.g., to <u>follow directions, ask for information, or explain something</u>.

. . .

School-age children (age 6 to attainment of age 12). When you are old enough to go to elementary and middle school, you should be able to learn to read, write, and do math, and discuss history and science. You will need to use these skills in academic situations to demonstrate what you have learned; e.g., by reading about various subjects and producing oral and written projects, solving mathematical problems, taking achievement tests, doing group work, and entering into class discussions. You will also need to use these skills in daily living situations at home and in the community (e.g., reading street signs, telling time, and making change). You should be able to use increasingly complex language (vocabulary and grammar) to share information and ideas

14

with individuals or groups, by <u>asking questions and expressing your own ideas</u>, and by understanding and responding to the opinions of others.

. . .

The following examples describe some limitations we may consider in this domain. Your limitations may be different from the ones listed here. Also, the examples do not necessarily describe a "marked" or "extreme" limitation. . . .

> (i) You do not demonstrate understanding of words about space, size, or time; e.g., in/under, big/little, morning/night.

> (ii) You cannot rhyme words or the sounds in words.

> (iii) You have difficulty recalling important things you learned in school yesterday.

> (iv) You have difficulty solving mathematics questions or computing arithmetic answers.

> (v) You talk only in short, simple sentences and have difficulty explaining what you mean.

20 C.F.R. § 416.926a(g).

As the above-emphasized language makes clear, both areas involve consideration of the child's ability to learn and use information, including the abilities to make decisions, solve problems, ask for information, follow directions, and explain or describe a matter. A split in authority exists as to whether a court can consider an ALJ's functional equivalency analysis of the domains to satisfy the ALJ's explanation of whether a child claimant met or medically equaled any listings. <u>See</u> <u>Fermin-Castillo o/b/o B.J.F. v. Kijakazi</u>, No. 21CV1495, 2022 WL

15

1774286, at *7 (E.D. Pa. May 31, 2022) (unpublished) ("The Commissioner asserts that there is significant overlap between the listing criteria of adapting and managing oneself and the functional equivalence domain of caring for oneself. . . . I will note that very few courts in th[e Third C]ircuit have considered this issue, and there is no definitive resolution of this issue based on their reasoning." (internal quotation marks omitted)); compare Crystal M. on behalf of D.R. v. Kijakazi, No. 21CV2240, 2022 WL 1567061, at *5 & n.6 (N.D. Ill. May 18, 2022) (unpublished) ("The evaluation process for minors at step three involves overlapping reasoning. Analysis of the four functional or 'Paragraph B' criteria used to determine whether impairments medically equal a listing (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself) requires an ALJ to ask largely the same questions about the same body of evidence as consideration of four of the six domains, which are used to decide if impairments functionally equal a listing (acquiring and using information; interacting and relating with others; attending and completing tasks; and caring for yourself). . . . While it would have made for a clearer ruling, separately analyzing the four criteria and the six domains would also have been redundant . . . [and] for a reviewing court to separate the analysis that way would run contrary to the established

propositions that an ALJ's opinion must be read as a whole and that the underlying reasoning should not be rigidly compartmentalized."); Janae M. o/b/o I.M. v. Kijakazi, No. 3:20CV1506, 2022 WL 292399, at *4 & n.38 (D. Conn. Feb. 1, 2022) (unpublished) ("In light of the substantial overlap between [Listing 112.11's] criteria and the functional equivalence domains, I do not separately analyze whether substantial evidence supports the ALJ's determination that the plaintiff's impairments did not meet the functional listing criteria. . . . [T]he relevant areas of mental functioning — concentration, persistence, and pac[e] and adaptation and self-management — are fully captured by the functional domains, such that independent consideration under both standards would be duplicative." (internal parenthetical citations omitted)); Grossnickle v. Kijakazi, No. 1:20CV375, 2021 WL 4478214, at *8 (M.D. Pa. Sept. 30, 2021) (unpublished) ("The evidence relevant to the 'B' Criteria set forth at Listings 112.08 and 112.11 directly overlaps with the evidence relevant to the six domains. Addressing each of the four categories set forth under the 'B' criteria, we find a corresponding category with the six domains. . . . [W]e find that the ALJ properly articulated his findings to the extent that would allow reasonable [judicial] review."); Noel on behalf of T.T. v. Saul, No. CV 20-1540, 2021 WL 4524120, at *7 (E.D. La. Sept. 16, 2021) (unpublished) ("Although the ALJ's opinion does not include a discussion of . . . whether

17

T.T.'s impairments meet or medically equal the severity of Listing 112.06 and different methods are employed for determining whether an impairment meets or medically equals a listing as opposed to whether the impairment is functionally equivalent to a listing, when there is a 'significant overlap' between the two in the context of a childhood impairment, the court may look to the ALJ's analysis of whether the impairments are functionally equivalent to the Listing in determining whether substantial evidence supports the ALJ's finding that his impairments do not meet or medically equal the Listing."), recommendation adopted, 2021 WL 4521885 (E.D. La. Oct. 4, 2021) (unpublished); Brown o/b/o C.M.B. v. Colvin, No. 13CV1073, 2014 WL 7272964, at *7 (W.D.N.Y. Dec. 18, 2014) (unpublished) ("Although the ALJ did not specifically refer to [] Listing [112.11's] criteria, his thorough discussion of the medical evidence, educational records, and hearing testimony reveals substantial support for his assessment that C.M.B. had marked limitations in only one domain of functioning — interacting and relating with others, which can be logically equated to the Listing criterion [concerning] social functioning." (internal quotation marks omitted); Magee v. Astrue, Civ. No. 09-620, 2011 WL 1226011, at *4 (S.D. Miss. Mar. 29, 2011) (unpublished) ("Though different methods are employed for determining whether an impairment meets or medically equals a listing as opposed to whether the impairment is functionally equivalent to a listing, the [c]ourt is persuaded that

18

there exists significant overlap between the two in the context of a childhood ADHD impairment. The [c]ourt cannot conclude that the ALJ's use of such a methodology was error, especially since the existence of substantial evidence is to be determined from the record as a whole." (internal citation omitted)); Rossi on behalf of C.R. v. Commissioner of Soc. Sec., No. 5:10CV97, 2010 WL 5313771, at 5 & n.6 (N.D.N.Y. Dec. 2, 2010) (unpublished) (finding no error in ALJ's incorporation of domain analysis into childhood listing analysis, noting that "[t]he domains are not identical to, but do substantially overlap the four areas of functioning that make up part of criteria for the listing for mental . . . retardation"), recommendation adopted, 2010 WL 5325633 (N.D.N.Y. Dec. 20, 2010) (unpublished); with Huffman on behalf of B.H. v. Astrue, 290 F. App'x 87, 89 (10th Cir. 2008) (The Commissioner argues that the lack of specific findings concerning whether B.H.'s impairments meet a listed impairment is saved by the ALJ's detailed discussion of the six domains used to measure functional equivalency. We disagree. . . . To be sure, the categories are similar; however, the Commissioner's rules for determining childhood disability claims explain that the six 'domains are specifically designed for determining functional equivalence and are completely delinked from the mental disorders and other listings.' 65 Fed. Reg. 54746, 54755 (Sept. 11, 2000). And although the argument might have merit if the ALJ had mentioned

19

the four categories in the context of his discussion concerning the six domains used to determine functional equivalency, he did not do so.  As such, his determination that B.H.'s impairments did not meet a listing is beyond meaningful judicial review." (some internal quotation marks omitted)); Lanique Q.R. on behalf of R.L.R. v. Commissioner of Soc. Sec., No. 19CV1196, 2021 WL 1226472, at *3 (W.D.N.Y. Mar. 31, 2021) (unpublished) ("Even where, as here, the ALJ determined that the child had less than a marked limitation in his ability to interact and relate with others, the ALJ cannot bootstrap onto later findings regarding functional equivalence in deciding whether plaintiff is disabled for symptoms which medically meet or equal a Listing.  While there may be some overlap between the subject matter of the six domains covering functional equivalence and the requirements of the second prong of 112.05(B), the ALJ's consideration of whether the child's impairments functionally equal the listing is not the same as considering whether those impairments literally meet the explicit provisions of 112.05(B)." (internal quotation marks, brackets, and citations omitted)); Mena on behalf of C.M. v. Commissioner of Soc. Sec., No. 1:19CV6810, 2021 WL 1222150, at *13 (S.D.N.Y. Mar. 31, 2021) (unpublished) ("Although there is some overlap between the areas of mental functioning and the six domains, there are critical distinctions that could have changed the ALJ's evaluation of C.M.'s eligibility."); R.D.L. v. Saul, Civ. No. 2:19-08699, 2021 WL

20

1163966, at *5 (C.D. Cal. Mar. 26, 2021) (unpublished) ("While the ALJ's functional equivalency finding that [the p]laintiff 'has had significant but less than marked limitation in interacting and relating with others,' might overlap and explain the lack of an extreme or marked limitation of the 'Interact with others' criterion of 112.10B2, there are no corresponding functional equivalency criteria for the other two listing criteria relied upon by [the p]laintiff: understanding, remembering, or applying information, and concentration, persistence, or maintaining pace. Even assuming there might be some overlap in the listing analysis and the functional equivalency analysis, the [c]ourt declines to conflate the two." (internal parenthetical citations omitted)); Romero o/b/o J.T.R. v. Saul, No. CV-19-71, 2019 WL 3937637, at *4 (W.D. Okla. Aug. 20, 2019) (unpublished) ("Even though the ALJ later discussed functional equivalencies, this discussion of the functional equivalence domains does not serve as a substitute for the requisite analysis of the [four] functional areas [of Listing 112.11]."); Vigil ex rel. V.D.V. v. Berryhill, No. 1:17CV316, 2018 WL 1182404, at *3 (D. Colo. Mar. 7, 2018) (unpublished) ("[T]he Commissioner argues that the ALJ's discussion of the functional equivalencies is a sufficient basis for affirming the ALJ's conclusion that V.D.V. did not meet or medically equal a listing. The court disagrees. Although there is some overlap between the

21

medical and functional equivalence inquiries, they are not entirely

coextensive." (internal citation omitted)).

Notwithstanding that split in authority in courts outside of

the Fourth Circuit, this Court (per now Chief Judge Thomas D.

Schroeder) has previously held that a court may consider an ALJ's

domain analysis when evaluating sufficiency of the ALJ's listing

determination:

> Although the ALJ's analysis at step three does not cite
> to specific evidence supporting the conclusion that
> D.P.'s ADHD fails to meet or medically equal Listing
> 112.11, the ALJ's subsequent discussion of the record in
> connection with the domain analysis makes clear for
> purposes of judicial review that substantial evidence
> supports the ALJ's finding at step three and the law
> requires nothing more. See Smith v. Astrue, 457 F. App'x
> 326, 328 (4th Cir. 2011) (concluding that, despite ALJ's
> "cursory" explanation at step three, ALJ's analysis at
> subsequent steps sustained step three determination);
> McCartney v. Apfel, 28 F. App'x 277, 279–80 (4th Cir.
> 2002) (rejecting challenge to ALJ's step three analysis
> for lack of sufficient detail where later discussion in
> administrative ruling adequately supported finding at
> step three and stating "that the ALJ need only review
> medical evidence once in his decision"); Kiernan v.
> Astrue, No. 3:12CV459, 2013 WL 2323125, at *5 (E.D. Va.
> May 28, 2013) (unpublished) (observing that, "[w]here the
> ALJ analyzes a claimant's medical evidence in one part of
> his decision, there is no requirement that he rehash that
> discussion in his Step 3 analysis").

> [The p]laintiff's citation to Huffman[], 290 F. App'x
> [at] 89 [], does not warrant a different conclusion. In
> that case, the ALJ ruled that the child claimant's ADHD
> did not meet or medically equal a listing without citing
> specific evidence. Huffman, 290 F. App'x at 89. The
> Commissioner argued that the ALJ's detailed discussion of
> the record while analyzing the six domains of functional
> equivalency "saved" the step three finding. Id. The
> Tenth Circuit disagreed, relying in large part on this
> language in the Federal Register: "[the six] domains are

22

specifically designed for determining functional
equivalence and are completely delinked from the mental
disorders and other listings." Id. (citing 65 Fed. Reg.
54746, 54755 (Sept. 11, 2000)). The Huffman court then
reversed the ALJ's step three ruling as "beyond
meaningful judicial review." Id.

In light of the Fourth Circuit authority cited above
approving of reliance on an ALJ's record review at later
stages for purposes of assessing the sufficiency of a
step three ruling, the Court should decline to give
Huffman any weight. Further, in a subsequently decided
case from a district court within Huffman's (Tenth)
Circuit, Johnson [on behalf of J.K.J.] v. Colvin, No.
12CV77, 2013 WL 3216064 (N.D. Okla. Jun. 24, 2013)
(unpublished), the court carefully analyzed Huffman and
persuasively explained why courts should not apply
Huffman's reasoning as Plaintiff here suggests:

>     At first blush, the language in Huffman
>     appears to be on point.  However, this court
>     does not read that unpublished decision as
>     establishing a rule that the ALJ's failure to
>     fully discuss the listings in a child's
>     disability case can never be overcome by a
>     thorough analysis of whether the child meets
>     the functional equivalence of a listing.  Such
>     a rule would be contrary to the Tenth
>     Circuit's decision in [published cases
>     declining to order] . . . unwarranted remands
>     where, although the ALJ's discussion of the
>     listings may be lacking, the factually
>     substantiated findings in the remainder of the
>     decision alleviate [ ] any concern that a
>     claimant might have been adjudged disabled at
>     step three.  Further, the language the Huffman
>     Court cited from the Federal Register does not
>     establish, or even suggest, such a rule.
>
>     Contrary to the Huffman Court's statement, the
>     language that the six domains to be considered
>     for determining functional equivalence to a
>     listing are "completely delinked" from the
>     listings does not appear in the Commissioner's
>     rules.  That language appears in an
>     explanatory section outlining changes that
>     were enacted to 20 C.F.R. § 416.926a

23

> (functional equivalence for children) after
> notice and comment. The quoted section of the
> Federal Register explains that the final rules
> were simplified so adjudicators would no
> longer have to refer to any of the listings
> when deciding functional equivalence. Use of
> the term "delinked" in the explanatory section
> does not purport to affect the scope or manner
> of judicial review. The "delinking" spoken of
> appears in 20 C.F.R. § 416.926a(d), "[w]e will
> not compare your functioning to the
> requirements of any specific listing." That
> language simply cannot be interpreted to alter
> judicial review.

Johnson, 2013 WL 3216064, at *4[.]

Picott ex rel. D.P. v. Colvin, No. 1:10CV710, 2014 WL 222095, at *5-6 (M.D.N.C. Jan. 21, 2014) (unpublished) (internal parenthetical citation omitted), recommendation adopted, slip op. (M.D.N.C. Mar. 6, 2014) (Schroeder, J.). In light of the Fourth Circuit authority relied upon in Picott, the Court should consider the ALJ's discussion of A.I.'s "marked" limitation in the Acquiring and Using Information domain (Tr. 79) to inform its evaluation of whether the new evidence raises a reasonable probability that the ALJ would have found that A.I. has an "extreme" limitation in understanding, remembering, or applying information.

The ALJ here discussed at length the evidence relating to A.I.'s ability to acquire and use information, making the following pertinent observations:

- "[O]n June 19, 2018, [A.I.] saw Amy Swaim, Speech Pathologist, CCC/SLP, for a consultative examination. [A.I.] recently completed kindergarten and received a promotion to first

24

grade. Her mother reported that [A.I.] read below
grade level. [A.I.] had an active [IEP] for speech
therapy. In addition, she received private
occupational therapy. . . . Oral and Written
Language Scales-II (OWLS II) testing showed
moderately disordered receptive and expressive
language skills. The Goldman-Fristoe Test of
Articulation-3 (GFTA-3) testing reve[a]led mildly
disordered articulation skills. [A.I.]'s speech
was 85% intelligible to an unfamiliar listener.
[A.I.]'s oral motor skills, voice, resonance,
prosody, and fluency were all within normal
limits. . . . Ms. Swaim stated that A.I.'s
language scores would affect her . . . learning in
a regular education classroom. Ms. Swaim
recommended ongoing speech and language therapy."
(Tr. 71 (emphasis added) (internal parenthetical
citation omitted).) "The [ALJ] affords this
assessment partial weight. Specifically,
moderate[] deficits in receptive and expressive
language skills and mild deficits in articulation
skills are consistent with and supported by the
totality of the evidence." (Tr. 74 (emphasis
added));

- "[A.I.], age 6, underwent a consultative
psychological examination with Thomas Keane, Ph.D.,
on July 12, 2018, for intelligence
testing. . . . [A.I.]'s mother described [A.I.] as
a slow learner. . . . [A.I.] presented as polite
and personable. She answered questions and her
speech was understood. [A.I.] did not appear to
have articulation difficulties. She did not offer
spontaneous conversation. [A.I.] needed directions
repeated and had some comprehension difficulties.
She worked at a slower than average speed.
Academic testing using the [WPPSI-IV] showed a
full-scale IQ score of 75, within the borderline
range of cognitive abilities. [A.I.]'s verbal
comprehension index score of 83 was in the low
average range. Her remaining scores indicated
visual spatial index of 73, fluid reasoning index
of 72, working memory index of 79, and processing
speed index of 75. The examiner stated that [A.I.]
had mild impairment in her cognitive and academic
functioning." (Id. (emphasis added) (internal
parenthetical citation omitted).) "[A.I.] could

25

sustain attention to perform simple repetitive tasks, understand, and follow instructions although she processed information slower. The [ALJ] affords this opinion significant weight." (Tr. 74 (emphasis added) (internal parenthetical citation omitted));

- "As of May 2019, [A.I.] made good progress towards her IEP goals. She received instruction in a regular education classroom and was to continue speech/language therapy in a quieter, less distracting environment, to focus on her specific goals." (Tr. 72 (internal parenthetical citation omitted));

- "[I]n October 2019, [A.I.] was reevaluated to determine continued eligibility for speech and language services. At that time, she was age 7 and in the second grade. Over the past three years, [A.I.] . . . made significant progress. Currently, her expressive and receptive language skills were below average. However, [A.I.]'s teacher did not believe that [A.I.]'s language skills were the reason she performed below grade level — the child's language skills were sufficient for academic performance. Her vocabulary skills were in the average range. During testing, [A.I.] had several articulation errors but none was consistent and several were restricted to specific words. The IEP team discontinued speech and language services. Based on testing, there was no support that [A.I.]'s language skills negatively affected her academics. Nor did she require specially designed instruction. Per Christine Holliday, school speech and language pathologist, [A.I.]'s receptive language weakness could be due to impulsive responses or lack of exposure." (Tr. 72-73 (emphasis added) (internal parenthetical citations omitted));

- "[T]he State agency consultants provided opinions on [A.I.]'s functioning. (1) On March 6, 2018, Angela Brown, M. Ed, CCC-SLP, stated that [A.I.] had a marked limitation in domain I . . . . (2) On March 8, 2018, [E]. Woods, M.D., and Linda Tyrrell, Psy.D., opined that [A.I.] had marked limitation in Domain I. . . . These opinions (1-2) are afforded

26

<u>significant</u> weight . . . ." (Tr. 74 (emphasis added));

- "The [ALJ] also has considered the statements of three of [A.I.]'s teachers. (1) On May 24, 2018, Christine Holliday, SLP, stated that [A.I.] had a speech and language impairment. Consequently, she received 12 sessions of speech and language therapy per reporting period. . . . Although she had some ongoing weakness, [she] showed <u>positive growth</u>. Her speech was <u>90%</u> intelligible to familiar listeners and <u>75%</u> to unfamiliar listeners. . . . (2) In June 2018, Crystal Sochor, Kindergarten Teacher, and Christine Holliday, SLP, completed a teacher questionnaire. [A.I.] had an <u>obvious</u> problem in domain I, to acquire and use information. She was most limited to express ideas in written form. . . . On October 29, 2019, Kimberly Meeks[] stated that she had taught [A.I.] for nine weeks in all core subjects. [A.I.] had an <u>obvious to a serious</u> problem in domain I, to acquire and use information. Her most problematic areas were providing organized oral explanations and adequate descriptions[] and expressing ideas in written form. . . . All of the aforementioned teacher statements are considered and given <u>some</u> weight. Notably, the ratings of a serious problem were noted only in a few areas of the assessments of Ms. Sochor and Ms. Holliday (2) and (3) Ms. Meeks. <u>The overall record does not indicate that</u> <u>[A.I.] has disabling problems</u>. Specifically, [A.I.] has a history of receiving school based speech and language therapy. Yet, she [] made progress with this treatment. <u>In September 2018,</u> <u>[A.I.] was discharged as it was determined she</u> <u>longer required speech and language therapy</u>. During an October 2018 IEP meeting, it was determined that [A.I.]'s language skills do not negatively affect her academics. Nor did she require specially designed instruction." (Tr. 75-76 (emphasis added) (internal parenthetical citations omitted).)

27

After that discussion and weighing of the relevant evidence, the ALJ provided the following analysis of A.I.'s limitation in the domain of Acquiring and Using Information:

> <u>Since March 9, 2018, A.I. has marked limitation in acquiring and using information</u>. In July 2018, WPPSI-IV testing showed a full-scale IQ score of 75, within the borderline range of cognitive abilities. Dr. [Tom] Keane, Ph.D., consultative examiner, opined that [A.I.] had only a mild cognitive and academic impairment. Throughout the record, [A.I.] received speech and language therapy. Her IEP team stated that she made progress and no longer warranted speech therapy as of September/October 2018 [sic]. At the hearing on October 30, 2019, [A.I.]'s mother testified that she is in regular classes at school and has no IEP or speech therapy, though she advocated for [A.I.] to return to speech and language services. The [ME] noted that [A.I.]'s speech ranged from 75-90% intelligible. In March 2018, [s]tate agency medical consultants . . . found [A.I.] had "marked" limitation in this domain. [A.I.]'s teachers [Kimberly] Meeks, and [Crystal] Sochor stated [A.I.]'s limitations were most prevalent in this domain. At the hearing, [the ME] clarified that the child overall had marked limitation in this domain, which includes consideration of the child's IQ for borderline functioning.

(Tr. 79 (underscoring in original).) That evidence and analysis overwhelmingly supported the ALJ's finding of a "marked" limitation in Acquiring and Using Information (Tr. 79) and thus, also provided substantial evidence to support a marked limitation in understanding, remembering, or applying information.

In the face of that evidence and the ALJ's above-quoted analysis, Plaintiff contends that the new evidence, reflecting A.I.'s full scale IQ of 59 on the Wechsler Intelligence Scale for Children - Fifth Edition ("WISC-V") administered at the Psycho-

28

[E]ducational Evaluation conducted by school psychologist Diane M. Zihal on September 9, 2020, establishes that A.I. has mild intellectual disability that meets the requirements of subparagraph (1)(a) of Listing 112.05B. (Docket Entry 17 at 18 (citing Tr. 47).)[6] With regard to the adaptive deficit requirement of subparagraph (2) of that Listing, Plaintiff maintains that the following aspects of the new "evidence support[] a finding that A.I. has . . . extreme limitation of her ability to understand, remember, or apply information" (id.):

- A.I.'s Adaptive Behavior Composite score of 67 ("Low" range) on the Vineland Adaptive Behavior Scales - Third Edition ("Vineland-3") (id. (citing Tr. 44, 49));

---

[6] The Commissioner appears to argue that A.I.'s Full Scale IQ score of 59 on the WISC-IV administered in September 2020 should not "relate back to AI's condition in March 2020" at the time of the ALJ's decision. (Docket Entry 20 at 17.) As discussed above, however, in cessation of benefits cases like the instant case, the Appeals Council must consider any evidence material to an issue in the case, without regard to whether that evidence relates to the period on or before the ALJ's decision. See "Limit on Future Effect of Applications and Related Changes in Appeals Council Procedures," 52 Fed. Reg. 4001, 4003 (Feb. 9, 1987) (providing that, "in SSI cases not based on an application for benefits (e.g., cases involving suspension or termination of benefits), the [Appeals Council] will consider additional evidence regardless of whether it relates to the period ruled on by the ALJ or to a subsequent period." (emphasis added)). Thus, the Appeals Council (and this Court) can properly consider that IQ score in conducting the materiality analysis. Furthermore, the fact that the Appeals Council must consider IQ evidence post-dating the ALJ's decision in CDR cases defeats Plaintiff's suggestion that the ALJ prejudicially erred by failing to "refer[] A.I. for an updated [c]onsultative [e]xamination" to obtain "sufficiently current intelligence scores" (Docket Entry 17 at 14 (citing Program and Operations Manual System ("POMS") DI 24583.06(C))). Moreover, as the Commissioner points out, that POMS section "instructs that 'IQ scores must be current to be used to meet or medically equal the requirements of listing 112.05[,]'" but "does not require an ALJ to get updated IQ scores when the existing IQ scores in the record do not meet or medically equal the requirements of Listing 112.05." (Docket Entry 20 at 17 n.1 (quoting POMS DI 24583.06(C)(1)) (emphasis supplied by the Commissioner).)

29

- A.I.'s "Very Low" range scores in most domains of the Woodcock-Johnson IV Tests of Achievement ("WJ-IV") (id. (citing Tr. 43, 48)); and

- A.I.'s Processing Speed score of 49 and Cognitive Proficiency score of 48 (<0.1 percentile, "Extremely Low" range) on the WISC-V (id. at 18-19 (citing Tr. 47)).

Plaintiff further notes that A.I.'s Processing Speed and Cognitive Proficiency scores on the WISC-V "fell three standard deviations or more below the mean" (id. at 18), and that "[t]he Commissioner's regulations state that [the] SSA will find an 'extreme' limitation when a claimant has 'a valid score that is three standard deviations or more below the mean on a comprehensive standardized test designed to measure ability or functioning in that domain' and the claimant's 'day-to-day functioning in domain-related activities is consistent with that score'" (id. at 19 (quoting 20 C.F.R. § 416.926a)).

Plaintiff over-relies on her "Very Low" scores on the WJ-IV and her "Extremely Low" scores on the WISC-V to raise a reasonable probability of a finding of an extreme limitation in understanding, remembering, or applying information. (Id. at 18-19 (citing Tr. 43, 47-48).) The regulations make clear that the SSA "will not rely on any test score alone," as well as that "[n]o single piece of information taken in isolation can establish whether [a child] ha[s] . . . an 'extreme' limitation in a domain." 20 C.F.R. § 416.926a(e)(4)(i). That regulation further states that the SSA

30

"may find that [a child] do[es] not have a[n] . . . 'extreme' limitation, even if [the child's] test scores are [three standard deviations below the mean], if other information in [the child's] case record shows that [his or her] functioning in day-to-day activities is not . . . very seriously limited by [his or her] impairment(s)."  20 C.F.R. § 416.926a(e)(4)(ii)(B).

Notably, A.I.'s Full Scale IQ score of 59 on the WISC-V does not fall three standard deviations (at least 45 points) below the WISC-V's mean of 100.  (See Tr. 47.)  In fact, 9 out of 11 of A.I.'s scores on the WISC-V and all of A.I.'s scores on the WJ-IV fall above three standard deviations.  (See Tr. 47-48.)  Although A.I.'s Processing Speed score of 49 and Cognitive Proficiency score of 48 fall more than three standard deviations below the mean (see id.), as discussed above, A.I. must also show "very serious[]" limitation in her day-to-day functioning in understanding, remembering, or applying information, see 20 C.F.R. § 416.926a(e)(4)(ii)(B).

Plaintiff's reliance on the responses of A.I.'s mother on the Vineland-3 to establish extreme limitations in her day-to-day functioning in understanding, remembering, or applying information also falls short.  Significantly, the ALJ found the statements of A.I.'s mother regarding A.I.'s functioning inconsistent with the record evidence:

> The [ALJ] has carefully considered the testimony and statements by [A.I.]'s mother who has expressed genuine care and concern for [A.I.]. The statements do not establish disability. There is no indication that [A.I.'s mother] is medically trained to make exacting observations as to dates, frequencies, types and degrees of medical signs and symptoms, or of the frequency or intensity of unusual moods or mannerisms, and therefore the accuracy of the statements is questionable. Moreover, by virtue of an indicated familial relationship with [A.I.], [her mother] cannot be considered a disinterested third party witness whose statements would not tend to be influenced by affection for [A.I.] and a natural tendency to agree with the symptoms and limitations [A.I.] alleges. Most importantly, significant weight cannot be given to the third party statements because[] they are simply not corroborated by the overall record evidence, including teachers and medical professionals, to show the extent of limitation alleged.

(Tr. 76 (internal parenthetical citation omitted).) Notably, Plaintiff did not challenge that finding by the ALJ insofar as it relates to statements by A.I.'s mother regarding A.I.'s ability to understand, remember, or apply information. (See Docket Entry 17 at 9-19.)

Moreover, the new evidence also shows that Plaintiff's second grade teacher, Kimberly Meeks, completed the Behavior Assessment System for Children - Third Edition ("BASC-3") and rated A.I. as "Within Normal Limits" in, among other areas, "Adaptive Skills" (Tr. 48), "School Problems" (id.), "Executive Functioning" (Tr. 49), and "Resiliency" (id.). School psychologist Diane Zihal noted that "all subareas were also within normal limits, except [] Learning Problems, Study Skills, and Functional Communication

32

[which] were rated At-Risk" but not "Clinically Significant." (Tr. 45.)[7] According to Ms. Zihal, Ms. Meeks' At-Risk ratings "suggest[ed] that [A.I. wa]s having <u>some</u> difficulty comprehending and completing schoolwork in a variety of academic areas[, ] demonstrate[d] weak study skills, [wa]s poorly organized[, ] ha[d] difficulty turning in assignments on time[,] . . . demonstrate[d] poor expressive and receptive communication skills[,] and ha[d] difficulty seeking out and finding information on her own." (<u>Id.</u> (emphasis added).) Those ratings harmonize with the evidence (discussed above) relied on by the ALJ to find a "marked" limitation in the Acquiring and Using Information domain (Tr. 79) and, in particular, the Teacher Questionnaires completed by Ms. Meeks and Ms. Sochor reflecting that A.I. had mostly "obvious," some "serious," and <u>no</u> "very serious" problems in the activities associated with the Acquiring and Using Information domain (Tr. 464, 525). <u>See</u> <u>Monk ex rel. E.M. v. Astrue</u>, No. 4:11CV36, 2012 WL 4459109, at *4 (W.D. Va. June 5, 2012) (unpublished) (finding the plaintiff had not shown evidence that E.M. had extreme limitation in Acquiring and Using Information domain, and observing that,

_____

[7] Ms. Meeks' answers on the BASC-3 contrast sharply to those of A.I.'s mother, the latter of whom rated A.I. as "At-Risk" or "Clinically Significant" in all of the domains listed in the Appendix to Ms. Zihal's report. (Tr. 48-49.) As noted by the Commissioner, "Psychologist Zihal's report reinforces the inconsistencies between AI's mother's statements and the assessments made by AI's teachers and it does not call into question the ALJ's factfinding regarding which evidence was more credible." (Docket Entry 20 at 17-18 (internal parenthetical citation omitted).)

"[a]lthough [E.M.'s] teachers noted several Domain 1 activities in which E.M. displays '[a]n obvious problem' or 'a serious problem,' they failed to identify a single Domain 1 activity in which he displays '[a] very serious problem'").

Lastly, A.I.'s new IEP does not raise a reasonable probability that the ALJ would have found A.I. to have an extreme limitation in understanding, remembering, or applying information. The regulations provide that, in rating the degree of limitation in a functional equivalency domain, the ALJ should consider "[t]he kind of help, and how much help the child needs to do activities, and how often the child needs it, and [ w]hether the child needs a structured or supportive setting, what type of structure or support the child needs, and how often the child needs it." 20 C.F.R. § 416.926a(b)(2). As the Commissioner notes (see Docket Entry 20 at 18 (citing Tr. 27)), A.I.'s new IEP reflects that she "w[ould] receive 30 minutes for reading and writing combined and 30 minutes for math 1 time per week for 5 weeks" (Tr. 27), which does not signal an extreme (or "the worst," 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 112.00F.2)) limitation in understanding, remembering, or applying information.[8]

---

[8] The IEP further described A.I. as "a student who listens to and follows school and classroom rules," while also noting that "[s]he accepts responsibility for her behavior and solves conflicts appropriately[, ] shows respect for peers, adults and property[, and] demonstrates effort to learn and seek help when needed." (Tr. 10.)

In sum, because Plaintiff has not shown that the new evidence submitted to the Appeals Council raises a reasonable probability of a favorable outcome in her claim, her first assignment of error fails to establish grounds for remand.

### 2. Attending and Completing Tasks

In Plaintiff's second and final issue on review, she argues that "the ALJ erred by failing to properly evaluate A.I.'s functional limitations in the domain of '[A]ttending and [C]ompleting [T]asks,' as the evidence documents that [A.I.] has marked limitation in that domain." (Docket Entry 17 at 19-20 (bold font and single-spacing omitted).)  More specifically, Plaintiff takes issue with the ALJ's stated reasons for the less than marked limitation, contending that the ALJ erred by 1) "specifically discount[ing] A.I.'s mother's report that the child had poor attention on the basis of A.I.'s presentation at a consultative examination" (id. at 20-21 (citing Tr. 80)), 2) "fail[ing] to provide a rationale as to why [the ALJ] afforded more probative value to evidence demonstrating activities that A.I. could do with only slight problems, as opposed to activities where A.I. was observed to have obvious to serious problems" (id. at 21), 3) "fail[ing] to examine [A.I.'s] limitations 'longitudinally'" (id. at 22 (citing 20 C.F.R. § 416.924a(b)(8), and Social Security Ruling 09-1p, Title XVI Determining Childhood Disability under the Functional Equivalence Rule — the "Whole Child" Approach, 2009 WL

35

396031 (Feb. 17, 2009) ("SSR 09-1p"))), 4) "rel[ying] on [the ME's] testimony at the hearing, . . . because his method of determining A.I.'s functional limitations in the domain of attending and completing tasks is in direct conflict with the guidance set forth in SSR 09-1p" (id. at 23), and 5) "rel[ying] on the [s]tate [a]gency consultants' opinions . . . [because the] consultants did not have the benefit of reviewing the overall record in this matter" (id. at 24-25). Plaintiff further maintains that, "[i]f the additional evidence that was submitted to the Appeals Council is properly considered, the [P]sycho[-E]ducational [E]valuation from School Psychologist[] Ms. Zihal[] supports the conclusion that A.I. has marked impairment in this domain." (Id. at 25 (citing Tr. 43).) Those arguments miss the mark.

The regulations describe the domain of Attending and Completing Tasks as follows:

> In this domain, [the SSA] consider[s] how well you are able to focus and maintain your attention, and how well you begin, carry through, and finish your activities, including the pace at which you perform activities and the ease with which you change them.
>
> . . .
>
> Attention involves regulating your levels of alertness and initiating and maintaining concentration. It involves the ability to filter out distractions and to remain focused on an activity or task at a consistent level of performance. This means focusing long enough to initiate and complete an activity or task, and changing focus once it is completed. It also means that if you lose or change your focus in the middle of a task, you

36

are able to return to the task without other people
having to remind you frequently to finish it.

. . .

School-age children (age 6 to attainment of age 12).
When you are of school age, you should be able to focus
your attention in a variety of situations in order to
follow directions, remember and organize your school
materials, and complete classroom and homework
assignments. You should be able to concentrate on
details and not make careless mistakes in your work
(beyond what would be expected in other children your age
who do not have impairments). You should be able to
change your activities or routines without distracting
yourself or others, and stay on task and in place when
appropriate. You should be able to sustain your
attention well enough to participate in group sports,
read by yourself, and complete family chores. You should
also be able to complete a transition task (e.g., be
ready for the school bus, change clothes after gym,
change classrooms) without extra reminders and
accommodation.

. . .

The following examples describe some limitations we may
consider in this domain. Your limitations may be
different from the ones listed here. Also, the examples
do not necessarily describe a "marked" or "extreme"
limitation. . . .

> (i) You are easily startled, distracted, or
> overreactive to sounds, sights, movements, or
> touch.
>
> (ii) You are slow to focus on, or fail to complete
> activities of interest to you, e.g., games or art
> projects.
>
> (iii) You repeatedly become sidetracked from your
> activities or you frequently interrupt others.
>
> (iv) You are easily frustrated and give up on
> tasks, including ones you are capable of
> completing.

37

> (v) You require extra supervision to keep you
> engaged in an activity.

20 C.F.R. § 416.926a(h).

Here, the ALJ found that A.I. had a "less than marked" limitation in Attending and Completing Tasks, and supported that finding with the following analysis:

> During the consultative examination [with Dr. Keane], [A.I.]'s mother reported that [A.I.] had poor attention. Conversely, [A.I.] did not present as restless or fidgety. Further, [Dr. Keane] opined that [A.I.] could sustain attention to perform simple repetitive tasks. [A.I.]'s teacher noted that [A.I.] had obvious to serious problems such as to complete work without mistakes and to carry out multistep instructions. However, [A.I.] had mostly slight problems to attend to and complete tasks. Per the [s]tate [a]gency consultants Dr. Pyle[ ] and Dr. Brandon Souther[ ], and the [ME]'s testimony at the hearing, the overall record supports less than marked limitation in this area.

(Tr. 80 (internal parenthetical citations omitted).) For the reasons that follow, the ALJ did not err in finding A.I. less than markedly limited in Attending and Completing Tasks, and the new evidence would not raise a reasonable probability that the ALJ would have found A.I. markedly limited.

Plaintiff first argues that the ALJ erred by "specifically discount[ing] A.I.'s mother's report that [A.I.] had poor attention on the basis of [her] presentation at a consultative examination." (Docket Entry 17 at 20-21 (citing Tr. 80).) According to Plaintiff, the regulations observe that "'[c]hildren may function differently in unfamiliar or one-to-one settings than they do in

38

their usual settings at home, at school, in childcare or in the community[ and ] may appear more or less impaired on a single examination (such as a consultative examination) than indicated by the information covering a longer period.'" (Id. at 21 (quoting 20 C.F.R. § 416.924a).)  Plaintiff further points out that those regulations provide that the SSA "'will not draw inferences about [a child's] functioning in other situations based only on how [he or she] function[s] in a one-to-one, new, or unusual situation.'" (Id. (quoting 20 C.F.R. § 416.924a).)

Plaintiff's argument glosses over a key word in that regulatory provision – the ALJ must "not draw inferences about [A.I.'s] functioning in other situations based only on how [she] function[s] in a [consultative examination]," 20 C.F.R. § 416.924a (emphasis added).  Here, the ALJ complied with that regulation by assessing A.I.'s limitation in Attending and Completing Tasks based not only on A.I.'s presentation at a consultative psychological evaluation, but also on the assessments by A.I.'s teachers and the opinions of the state agency consultants.  (See Tr. 80.)[9]

Next, Plaintiff faults the ALJ for "fail[ing] to provide a rationale as to why she afforded more probative value to evidence demonstrating activities that A.I. could do with only slight problems, as opposed to activities where A.I. was observed to have

---

[9] This Recommendation addresses the ALJ's reliance on the ME's hearing testimony as to this domain in more detail in the discussion which follows.

obvious to serious problems." (Docket Entry 17 at 21.) In that regard, Plaintiff notes that Ms. Meeks rated A.I. as having "'obvious' daily problems focusing, distracting others, and carrying out single-step instructions, and 'serious' problems carrying out multistep instructions." (Id. (quoting Tr. 526).)[10] Plaintiff further emphasizes that "'the rating of limitation of a domain is not an "average" of what activities the child can and cannot do,'" as well as that "'[t]he fact that a child can do a particular activity or set of activities relatively well does not negate the difficulties the child has in doing other activities.'" (Id. at 21-22 (quoting SSR 09-1p, 2009 WL 396031, at *10).) According to Plaintiff, "'an ALJ . . . cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding.'" (Id. at 22 (quoting Lewis v. Berryhill, 858 F.3d 858, 869 (4th Cir. 2017)).) In a related argument, Plaintiff asserts that the ALJ "failed to examine [A.I.'s] limitations [in Attending and Completing Tasks] 'longitudinally'" (id. (citing 20 C.F.R. § 416.924a(b)(8), and SSR 09-1p)), in that "[t]he ALJ failed to consider the impact of [A.I.'s] functional limitations on a daily, weekly, and monthly basis" (id. at 23).

---

[10] Contrary to Plaintiff's assertion, Ms. Meeks did not assign an obvious problem rating to the activity of "[w]orking without distracting self of others"; rather, Ms. Meeks found that A.I. had only a slight problem in that activity. (Tr. 526.)

40

Contrary to Plaintiff's argument, the ALJ here neither averaged nor cherrypicked A.I.'s limitations in Attending and Completing Tasks. "The [Teacher Q]uestionnaire contains an entire section addressing the domain of [A]ttending and [C]ompleting [T]asks, and asks the school officials to rate [A.I.]'s functioning in thirteen subcategories of the domain." Avery ex rel. S.R. v. Colvin, No. 1:14CV694, 2015 WL 667979, at *5 (N.D. Ohio Feb. 17, 2015) (unpublished) (internal citations omitted). "The [Q]uestionnaire asks that a student's limitations be assessed on a scale of one through five[, where o]ne represents 'no problem,' two represents a 'slight problem,' three represents an 'obvious problem,' four represents a 'serious problem,' and five represents a 'very serious problem.'" Id. at 5 n.2. The ALJ here expressly discussed Ms. Meeks' October 2019 ratings of A.I. in Attending and Completing Tasks, observing that Ms. Meeks found "that [A.I.] had obvious to serious problems such as to complete work without mistakes and to carry out multistep instructions," but "had mostly slight problems to attend to and complete tasks." (Tr. 80 (emphasis added).)[11] Thus, the ALJ expressly acknowledged the one activity, i.e., "carry[ing] out multistep instructions," in which

_____

[11] Ms. Meeks rated A.I. has having no problem in one activity in Attending and Completing Tasks, a slight problem in seven activities, an obvious problem in four activities, a serious problem in one activity, and a very serious problem in none of the activities. (See Tr. 526.) In light of those ratings, the ALJ did not err by stating that Ms. Meeks found that A.I. "had mostly slight problems to attend to and complete tasks" (Tr. 80 (emphasis added)).

41

Ms. Meeks rated A.I. has having a serious (but not a very serious) problem.  (Id.)[12]

Plaintiff essentially asks the Court to reweigh the evidence relating to A.I.'s ability to attend and complete tasks, and find that, upon such reweighing, the evidence favors a marked limitation in that domain.  Such an approach misconstrues the Court's standard of review, which tasks the Court with determining only whether the ALJ applied the correct legal principles and whether substantial evidence supported the ALJ's less than marked limitation in Attending and Completing Tasks.  See Maust v. Colvin, No. 5:13CV2353, 2014 WL 4852064, at *5-6 (N.D. Ohio Sept. 29, 2014) (unpublished) ("[The plaintiff] does not identify any evidence that plainly undermines the ALJ's finding.  She merely identifies evidence that, in her view, supports a finding of marked impairments. . . .  Such an argument misconstrues the substantial evidence standard. . . . 'The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. . . .  This is so because there is a "zone of choice" within which the

---

[12] Although the ALJ had earlier summarized Ms. Sochor's ratings on a June 2018 Teacher Questionnaire (see Tr. 75-76), the ALJ did not expressly rely on those ratings in his discussion of the less than marked rating in Attending and Completing Tasks (see Tr. 80).  It bears noting, however, that Ms. Sochor, who completed her Questionnaire during the relevant period in this case, rated A.I. as having no problem or a slight problem in all 13 activities in the Attending and Completing Tasks domain (see Tr. 465), which provides further evidence to support the ALJ's less than marked rating in that domain (see Tr. 80).

42

Commissioner can act, without the fear of court interference.' Buxton v. Halter, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted). . . . Because the Commissioner has a zone of choice, legal error is not established by pointing to evidence that could have resulted in a different outcome.").

With regard to the ALJ's consideration of A.I.'s limitations on a longitudinal basis, Plaintiff correctly asserts that the ALJ did not expressly discuss how frequently, i.e., hourly, daily, weekly, or monthly, A.I.'s limitations in the activities relating to Attending and Completing Tasks occurred (see Docket Entry 17 at 22-23; see also Tr. 80). Plaintiff has failed to show, however, that such an omission by the ALJ amounted to legal error or otherwise rendered her less than marked finding unsupported by substantial evidence.

SSR 09-1p explains that how frequently a child's limitations occur is one of many factors an ALJ must consider in rating the degree of limitation in a domain:

> The rating of limitation in a domain is [] based on the answers to these questions:
>
> 1. How many of the child's activities in the domain are limited (for example, one, few, several, many, or all)?
>
> 2. How important are the limited activities to the child's age-appropriate functioning (for example, basic, marginally important, or essential)?
>
> 3. How frequently do the activities occur and how frequently are they limited (for example, daily, once a week, or only occasionally)?

43

4. <u>Where</u> do the limitations occur (for example, only at home or in all settings)?

5. <u>What factors are involved</u> in the limited activities (for example, does the child receive support from a person, medication, treatment, device, or structured/supportive setting)?

SSR 09-1p, 2009 WL 396031, at *9 (emphasis added). Significantly, SSR 09-1p makes clear that "[t]here is no set formula for applying these considerations in each case," id. (emphasis added), as well as that the SSA "do[es] not require [ALJ]s to discuss all of the considerations [for determining functional equivalence] in their determinations and decisions, only to <u>provide sufficient detail so that any subsequent reviewers can understand how they made their findings</u>," id. at *3 (emphasis added). See <u>Bryan o/b/o L.J.P. v. Commissioner of Soc. Sec.</u>, No. 5:16CV987, 2017 WL 3530367, at *8 (N.D.N.Y. Aug. 16, 2017) (unpublished) ("[The p]laintiff takes issue with the ALJ's use of the 'whole child' approach, highlighting that the ALJ failed to discuss a series of questions as set forth in SSR 09-1p. SSR 09-1p, however, provides that an ALJ is not required to discuss all considerations provided therein. Instead, an ALJ needs 'only to provide sufficient detail so that any subsequent reviewers can understand how they made their findings.'" (quoting SSR 09-1p, 2009 WL 396031, at *3) (internal citations omitted)).

The ALJ here, in a previous portion of her decision, discussed a significant amount of evidence bearing on A.I.'s ability to

44

attend and complete tasks, including the consultative psychological examination (and resulting opinions) of Dr. Keane (see Tr. 71), the Teacher Questionnaire ratings of Ms. Sochor and Ms. Meeks (see Tr. 75-76), as well as the opinions of the state agency consultants (see Tr. 75), as they related to the domain of Attending and Completing Tasks. In that regard, the ALJ assigned "significant weight" to Dr. Keane's opinion that A.I. could sustain attention to perform simple repetitive tasks (Tr. 74), accorded "some weight" to the activity ratings of Ms. Sochor and Ms. Meeks in Attending and Completing Tasks (Tr. 76), and credited the state agency consultants' finding of less than marked in Attending and Completing Tasks (see Tr. 75). The ALJ then listed that evidence as the basis for her less than marked finding in Attending and Completing Tasks. (See Tr. 80.) That analysis "provide[s] sufficient detail so that [this Court on judicial] review[] can understand how the[ ALJ] made [he]r findings," SSR 09-1p, 2009 WL 396031, at *3. See Davenport on behalf of J.E.D. v. Commissioner of Soc. Sec., No. 16CV11963, 2017 WL 3976616, at *3 (E.D. Mich. Sept. 11, 2017) (unpublished) ("Pursuant to SSR 09-1p, ALJs are not required to discuss each potentially relevant consideration listed. ALJs must only provide sufficient detail such that subsequent reviewers can understand how they made their findings. This can be accomplished by explaining the weight an ALJ gives questionnaires and opinions in the record." (internal citation omitted) (emphasis

45

added)); see also Orr ex rel. ADH v. Commissioner of Soc. Sec., No. 1:11CV192, 2012 WL 4504503, at *7 (N.D. Ohio Sept. 30, 2012) (unpublished) ("I find that the more current functional evidence provides a reviewable record on which to evaluate the ALJ's decision under the whole child approach. SSR 09-1p requires no more.").

Plaintiff additionally challenges the ALJ's "reli[ance] on [the ME's] testimony at the hearing, . . . because his method of determining A.I.'s functional limitations in the domain of attending and completing tasks is in direct conflict with the guidance set forth in SSR 09-1p." (Docket Entry 17 at 23.) In that regard, Plaintiff notes that SSR 09-1p cautions that "'the rating of limitation of a domain is not an "average" of what activities the child can and cannot do,'" and that "'[a] child's day-to-day functioning may be considered "seriously" or even "very seriously" limited whether [her] impairments impact only one activity or limit several activities' within a domain." (Id. at 23-24 (quoting SSR 09-1p, 2009 WL 396031, at *9).) According to Plaintiff, the ME "testified that his technique for formulating his opinion that A.I. had less than marked limitation[] in [A]ttending and [C]ompleting [T]asks was by averaging the teacher's responses." (Id. at 24 (citing Tr. 111).)

The following exchange took place between A.I.'s attorney and the ME at the hearing:

46

[ATTY:]     What made you decide to say that [A.I.] had less than marked in [A]ttending and [C]ompleting [T]asks[, i]nstead of a marked limitation in that area?

[ME:]       Well, let's see what the teacher said. . . . The teacher says [A]ttending and [C]ompleting [T]asks a slight problem. So, to me that would mean less than marked.

[ATTY:]     . . . [A]re you looking at [Ms. Meeks' teacher questionnaire]?

[ME:]       Yes.

[ATTY:]     What about question 3 through 5, and question 11? Where her teacher says that on those tasks [A.I.] has an obvious[] problem and a serious problem?

[ME:]       I kind of look at those teacher evaluations and <u>I kind of average out the responses that the teacher makes</u>. . . .

            [Questions] 3 through 6, yes . . ., but the <u>majority of the questions answered were a slight problem</u>. . . . <u>[Y]ou have to take the totality of the rating,</u> <u>you can't just pull out each one individually[ a]nd say that proves that she has a marked limitation</u>.

. . .

            That's the way I look at it. That's the way I evaluate it. <u>I . . . kind of take the average of everything</u>. . . . I think to be able to say she has a marked limitation . . . she needs to have a whole bunch of X's in the fourth row[, w]hich is a serious problem.

. . .

[ATTY:]     Did you take into consideration that[,] where the teacher marked obvious and serious problem, . . . the majority of those problems were occurring daily?

47

```
     [ME:]      Yes, I did.  But I still didn't think that
                this made her a marked limitation.

     [ATTY:]    And why is that?

     {ME:]      Because that is the way I did it.  That's the
                way I evaluated it.  I will attest it was not
                a marked limitation. . . .  [T]o have a marked
                limitation, you really have to have a lot of
                problems.  Not just cherry pick little ones
                out of the whole thing. . . .  [T]hat's not
                the way I do it.  I don't look at it that way.
```

(Tr. 110-12 (emphasis added).)

The ME did not transgress the policies of SSR 09-1p by noting

(as did the ALJ (see Tr. 80)) that Ms. Meeks rated the majority

(seven out of 13) of the activities in Attending and Completing

Tasks as a slight problem for A.I.  (See Tr. 110.)  SSR 09-1p lists

the number of activities limited as a factor that must be

considered in rating the degree of severity of limitation in a

domain.  See SSR 09-1p, 2009 WL 396031, at *9.  The ME, however,

did run afoul of SSR 09-1p to the extent that he "averaged" Ms.

Meeks' ratings to come up with the less than marked limitation.

See id. ("[T]he rating of limitation of a domain is not an

'average' of what activities the child can and cannot do.").

However, the Court should find that error harmless because, even

without the ALJ's reliance on the ME's less than marked limitation

in that domain, the ALJ pointed to substantial evidence, as

discussed above and below, to support her less than marked rating.

See generally Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989)

48

(observing that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result").

Plaintiff further contests the ALJ's "reli[ance] on the [s]tate [a]gency consultants' opinions . . . [because the] consultants did not have the benefit of reviewing . . . Ms. Meek's Teacher Questionnaire and A.I.'s educational records subsequent to September 2018." (Docket Entry 17 at 24-25.) As discussed above, Ms. Meeks' Teacher Questionnaire supported rather than undermined the ALJ's finding of a less than marked limitation in Attending and Completing Tasks and thus would also have further supported the consultants' less than marked ratings. Moreover, Plaintiff neither provided a citation, much less elaborated on which "educational records subsequent to September 2018" she meant, nor explained how such records would have changed the consultants' opinions in Attending and Completing Tasks. (See id.) That failure precludes relief. See Maust, 2014 WL 4852064, at *7 ("[The plaintiff ] suggests that the ALJ's decision to credit the [s]tate [a]gency opinions was erroneous because the [s]tate [a]gency consultants did not have the benefit of reviewing some of BW's more recent medical and school records. [The plaintiff], however, does not cite any supporting law or regulation. Furthermore, [the plaintiff] fails to explain how these recent records are inconsistent with the

[s]tate [a]gency's consultants' opinions.  It is not the [c]ourt's function to comb through the entire record to develop an argument on [the plaintiff's] behalf.").

Finally, Plaintiff posits that, "[i]f the additional evidence that was submitted to the Appeals Council is properly considered, the [P]sycho[-E]ducational [E]valuation from School Psychologist[] Ms. Zihal[] supports the conclusion that A.I. has marked impairment in this domain."  (Docket Entry 17 at 25 (citing Tr. 43).)  In particular, Plaintiff points to Ms. Zihal's "observ[ation] that A.I. had 'tremendous difficulty with attention and processing directions'" (id. (quoting Tr. 43)), and deems that observation "consistent with [A.I.'s] significantly low Cognitive Proficiency score on the WAIS-V [sic]" (id. (citing Tr. 43)).

Plaintiff's argument fails, in part, because she primarily relies on a single observation in a one-to-one consultative examination to support a marked limitation in Attending and Completing Tasks.  As Plaintiff herself acknowledged, the SSA "'will not draw inferences about [a child's] functioning in other situations based only on how [he or she] function[s] in a one-to-one, new, or unusual situation.'"  (Id. at 21 (quoting 20 C.F.R. § 416.924a).)  Moreover, Ms. Zihal's report also reflects Ms. Meeks' ratings of A.I.'s behavior throughout the 2019-20 school year on the BASC-3 (see Tr. 45, 48-49), which "indicate[] that [A.I. wa]s not having significant issues with . . . Attention

50

Problems at school" (Tr. 45; see also id. ("[A.I.] was seen as not having issues with . . . Attentional Control . . . ."). On balance, Ms. Zihal's report does not raise a reasonable probability of a finding of a marked limitation in Attending and Completing Tasks.

Simply put, Plaintiff's second issue on review falls short.

### III. CONCLUSION

Plaintiff has not established grounds for remand.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for Summary Judgment (Docket Entry 16) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 19) be granted, and that this action be dismissed.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

November 21, 2022

51